**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| JERALD MCMILLAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. |
| | ) | |
| TARGET CORPORATION, | ) | |
| Serve: Registered Agent | ) | |
| CT Corporation System | ) | |
| 120 S. Central Avenue | ) | |
| Clayton, Missouri, 63105 | ) | |
| | ) | |
| Defendant. | ) | |

## <u>COMPLAINT</u>

Plaintiff Jerald McMillan ("Jerry" or "Plaintiff"), for his Complaint against Defendant Target Corporation ("Target"), states as follows:

### PARTIES, JURISDICTION AND VENUE

1.   Plaintiff is an individual residing in Missouri.

2.   Defendant is a foreign corporation with its principal office or corporate headquarters located in Minnesota.

3.   The Court has jurisdiction over this action, which includes claims arising under the Missouri Human Rights Act (RS Mo. § 213.111, *et seq.*) (the "MHRA") and the Age Discrimination in Employment Act (29 U.S.C. § 621, *et seq.*) (the "ADEA"), pursuant to 28 U.S.C. § 1332.

4.   Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) because Target does business in Missouri and because the events or omissions giving rise to the subject matter of this action occurred in Missouri.

## FACTUAL BACKGROUND

5.     Plaintiff began working with Target in South Setauket, New York, in September 2003.

6.     Plaintiff was a Store Director for 17 years, and he opened Target's location in Branson, Missouri, in 2006.

7.     In 2008, Plaintiff took over the Springfield, Missouri store in 2008, where he was the Store Director until February 13, 2020.

8.     In his time with Target, he was never written up and had never been coached in connection with his performance.

9.     In his time with Target, Plaintiff won dozens of awards including District MVP, Group MVP, and in 2016, he won the Region 300 MVP.

10.    In the Fall 2018, Plaintiff received the Region 100, Store Modernization Pacesetter Award.

11.    In the last year and a half of his employment, two of Plaintiff's Executive Team Leads ("ETL" or "ETLs") were promoted—Chuck Williams was promoted to a Store Director and James Bowman to a Business Partner.

12.    Plaintiff loved working with his team at Target, but in May of 2019, after he turned 62, the way he was treated by upper management and his supervisors (who were younger than him and new in their roles) at Target drastically changed.

13.    The first age-related comment that Plaintiff recalls hearing was from Plaintiff's direct supervisor, Chris Brookhouser, District Store Director ("DSD"), on a phone conversation.

14.    Brookhouser stated, "I've been talking to Kevin and all his Store Directors ("SD" or "SDs") are younger and they aren't having any problem with modernization."

2

15.     During this time, Plaintiff had been without a Logistics' ETL for several months.

16.     Plaintiff thought it was odd that Brookhouser immediately attributed any issues in Plaintiff's store as being related to his age.

17.     Plaintiff had just received the Region 100, Stores Modernization Pacesetter award less than a year earlier.

18.     It was shocking for Plaintiff to hear his age thrown at him in such a derogatory, but casual way.

19.     After turning 62, during random phone calls, it seemed like Brookhouser was calling to verbally attack Plaintiff and lie about Plaintiff's character.

20.     Plaintiff had never been spoken to like this in 17 years with Target.

21.     At first, Plaintiff was shocked and confused, and then he tried defending himself.

22.     Plaintiff suggested that Brookhouser, who is younger than Plaintiff and who was new in his role as Plaintiff's supervisor, talk to other Target employees who have become successful throughout Target and who had known Plaintiff for years.

23.     Plaintiff's that his conversations with Brookhouser were always one-sided conversations and that Brookhouser's only objective was to hurt, humiliate, and emotionally beat Plaintiff up so he would quit.

24.     The last time Brookhouser did this to Plaintiff was on October 30, 2019.

25.     Four ETLs were in Plaintiff's office at the time.

26.     Brookhouser's lies and character assassination of Plaintiff went on for 10 minutes as documented on Plaintiff's cell phone.

27.     In July 2019, Brookhouser and Sarah Pavan (District Human Resources Business Partner) came to the store to discuss the Best Team Survey results from May 2019.

3

28.     During this conversation, Brookhouser started reading (out loud from his laptop) what he called an anonymous letter from a Team member.

29.     Plaintiff did not see an actual document, though, so Plaintiff does not know if whatever Brookhouser was reading was legitimate.

30.     The entire letter that Brookhouser was reading was mean, hateful, and discriminatory, and it was attacking Plaintiff's age and his ability to run a store because of his age.

31.     The person that apparently wrote the document allegedly believed that Plaintiff should retire because of his age.

32.     It felt like the entire point of this letter—and Brookhouser's reading out loud of the letter—was to discriminate against Plaintiff due to his age.

33.     Plaintiff was shocked that Brookhouser and Pavan felt that such a discriminatory letter should be given any attention at all, let alone that it should be read out loud to Plaintiff in such detail.

34.     Then, Pavan, who had not spoken to all of the Team Leads – Hourly Department Managers, said, "And that's the consensus of all the Team Leads—you're too old and you need to retire".

35.     Plaintiff does not believe that all of his Team Leads felt that way.

36.     Following this meeting, Pavan started coming to the store once a week on Plaintiff's day off, Wednesday, and excluding Plaintiff from normal business decisions that he had always been involved in prior to turning 62.

37.     For example, Brookhouser and Pavan gave the store's HR ETL a raise without Plaintiff's input or opinion.

38.     He had never been excluded from an ETL pay raise prior to turning 62.

4

39.     In September 2019, the store's Assets Protection ("AP") ETL resigned due to her new work schedule that had her working more evenings and weekends.

40.     The AP ETL had a two-year-old son, and her new schedule did not support her family life.

41.     The AP ETL found a Monday to Friday job.

42.     Plaintiff spoke with the ETL regarding her situation, as did Anita, who was the store's HR ETL, regarding the AP ETL's situation.

43.     Within a day or two of the AP ETL giving her two-week notice, Pavan (whose office is in Arkansas) made a special trip to Plaintiff's store to do an Exit Interview with the AP ETL.

44.     This surprised Plaintiff because Pavan could have easily waited to do the Exit Interview during her normally scheduled visit.

45.     Plaintiff wondered if she has made a special trip to every other store to do Exit Interviews within two days of a receiving a resignation—especially those that are out of state.

46.     After Pavan spoke to the AP ETL, Pavan confronted Plaintiff and said, "Jerry, [she] is leaving because of you."

47.     Plaintiff said, "Sarah you know that is not true, this is more of the same made up crap that I had to listen to you and Chris tell me in my office, telling me that I'm too old to do my job. I'm sick of it. I've talked to my Team Leads and they do not feel that I can't do my job or that I'm too old to do my job."

48.     Pavan said, "Why are you getting so mad," and Plaintiff said "because I'm sick of getting beat up from you and Chris with this made up crap that other people are saying that I'm

too old and I can't do my job anymore. You know as well as I do you could easily sway people's opinions in a group if you wanted to."

49. Following that conversation, Pavan told the HR ETL that she thought she had irreversibly damaged her relationship with Plaintiff.

50. On October 30, 2019, Janna Potts (Executive VP and Chief Store's officer), Brad Taylor-White (Senior VP, Store HR) and Juan Galarraga (Senior VP, Store Operations), plus others, visited Plaintiff's store.

51. In Plaintiff's experience, it was a very good visit, and he enjoyed walking the store with them.

52. Potts complimented Plaintiff's store several times, noting that "the zone looks good, the store looks good."

53. Potts liked Plaintiff's store's merchandising decisions, and she liked the feel of the store.

54. Potts also asked about Plaintiff's background.

55. It was an overall very positive, professional experience for Plaintiff.

56. That very positive visit meant a lot to Plaintiff because he had not experienced many professional interactions within Target since turning 62.

57. Immediately after the group left, Plaintiff called Brookhouser to tell him about the positive visit.

58. Plaintiff felt like his team's hard work had been validated by such a big visit.

59. During the conversation, Brookhouser told Plaintiff that Erica DeVasier (Group Vice President) and Joe Contrucci (Senior Vice President, Stores) might be coming by for a visit, but he was not sure since Potts had already visited.

6

60.    At 5:45 pm, DeVasier and Contrucci arrived at Plaintiff's store.

61.    Soon after entering the store, Contrucci received a phone call and he stepped away.

62.    Along with several ETLs, DeVasier and Plaintiff started to walk the store.

63.    The emotional harassment and hostility that Plaintiff felt from DeVasier is difficult to describe; it was so extreme and obvious that several of Plaintiff's ETLs commented on it to Plaintiff.

64.    Many asked him since he turned 62, "Do you think they're out to get you?"

65.    Plaintiff's ETLs pointed out that DeVasier would not even answer Plaintiff's questions.

66.    There was a complete disconnect; Plaintiff did not feel like DeVasier valued him or what he could contribute, due to his age.

67.    At one point during the visit she said, "Do you even know what a Brand Store looks like, do I need to send you somewhere?"

68.    DeVasier's evaluation of the store was 100 percent different from Potts' evaluation only hours earlier.

69.    DeVasier started off by telling Plaintiff that the store was "red" in Soft Lines. (This means, essentially, that DeVasier's subjective assessment was that the store had poor zoning in Apparel. Plaintiff and his team completely disagreed with DeVasier's assessment.)

70.    In Seasonal, the same area that Potts had stated Plaintiff's store was making wise merchandising decisions in, DeVasier criticized the store's decisions.

71.    When the group went into the backroom, DeVasier immediately asked how many storage container's the store was using.

7

72.     Plaintiff told her that the store had nine corporate-approved containers and that the store was following the corporate direction of what could and could not be put inside.

73.     DeVasier stated that the store should not put any sellable merchandise in the storage containers.

74.     Plaintiff said, "What about Black Friday?" and DeVasier put her hand straight out with her hand raised in a stop motion toward Plaintiff and said "Jerry, I said no."

75.     Obviously, Plaintiff's store would not be successful if it was not allowed to utilize its corporate resources or follow corporate directions.

76.     To Plaintiff, it felt like DeVasier's only motivation for visiting was to undermine any success Plaintiff and his team had felt from Potts' visit earlier that day.

77.     Prior to turning 62, Plaintiff enjoyed positive, professional relationships with his supervisors.

78.     The year before, Plaintiff had had two great visits with Contrucci, but Plaintiff had very little contact with Contrucci during this visit.

79.     After DeVasier and Contrucci left, the ETLs and Plaintiff all went to Plaintiff's office to try and make sense of what had just happened.

80.     It was hard to comprehend how the store had went from such a motivating, uplifting, positive visit with Potts and her team, to the demoralizing, angry, and confusing visit from DeVasier just hours apart from one another.

81.     While the group was in Plaintiff's office, Brookhouser called and started screaming at Plaintiff, who held the phone to his ear the entire time.

82.     Brookhouser was so angry and screamed so loudly the ETLs all sat there looking shocked as he screamed at Plaintiff for 10 solid minutes as documented on Plaintiff's cell phone.

8

83.     At one point, the HR ETL received a phone call from Pavan, and the HR ETL left the room to talk with Pavan.

84.     Brookhouser accused Plaintiff of lying about telling Brookhouser about the good visit with Potts; Brookhouser said it was a "fake visit" and that Plaintiff "was exaggerating".

85.     Brookhouser said that "Janna and everyone couldn't stand you, they thought you were full of yourself."

86.     Brookhouser also said that Joe was afraid that "all the ETLs were going to quit and they couldn't lose all of the ETLs because of [Plaintiff]."

87.     When he was finished screaming, two ETLs had tears in their eyes, and the other ETL stayed behind trying to support Plaintiff.

88.     On November 5, 2019, Brookhouser came to the store to meet with the Starbucks DM.

89.     Immediately following that visit, Brookhouser started pulling in Plaintiff's ETLs to meet with him individually.

90.     Brookhouser had not told Plaintiff ahead of time that he was going to do this.

91.     Plaintiff was completely left out of what was going on in his own store during this entire process, as Brookhouser excluded Plaintiff from all the meetings—meeting that Plaintiff had been part of prior to turning 62.

92.     Plaintiff was off work on Friday, November 15, 2019, and he texted Brookhouser on Thursday to remind him.

93.     Brookhouser responded but did not tell Plaintiff that he planned to go to Plaintiff's store while Plaintiff was out.

94.     Prior to Plaintiff turning 62, Brookhouser had never gone to Plaintiff's store when Plaintiff was not there without Plaintiff's knowledge.

95.     Prior to Plaintiff turning 62, Brookhouser had never gone to Plaintiff's store and not provided any follow up information to Plaintiff regarding his visit.

96.     Plaintiff was informed about the visit by an ETL.

97.     This increasing amount of time that Brookhouser was excluding Plaintiff from normal business practices—and the consistent and unrelenting attacks on Plaintiff's age and inability work effectively because of his age—created a harassing and hostile working environment for Plaintiff.

98.     Plaintiff experienced overwhelming stress, both physical and mental, on account of the work environment that Brookhouser, Pavan, and others had forced him to work in.

99.     On November 19, 2019, Plaintiff awoke with extreme vertigo, possibly related to stress.

100.     Plaintiff sent a text to Brookhouser, letting him know that Plaintiff was not feeling well.

101.     Brookhouser responded thanks, and then he went back into Plaintiff's store while Plaintiff was out sick.

102.     Plaintiff became concerned that Brookhouser's continual, out of the ordinary visits to Plaintiff's store while Plaintiff was out, were undermining Plaintiff's effectiveness as a leader.

103.     Overall, since turning 62, Plaintiff received numerous, disparaging remarks concerning his age.

104.     He was harshly criticized, verbally harassed, and demeaned.

105.     He had never experienced this type of treatment before turning 62.

10

106.    He was lied to and lied about in a group effort to hurt and humiliate Plaintiff to get him to retire.

107.    Plaintiff was also harassed numerous times regarding his salary and bonus, which are the result of consistently following Corporate Directions and building a strong team for seventeen years.

108.    Plaintiff's bonus is a direct reflection of meeting Corporate established metrics.

109.    The behaviors and decisions of Plaintiff's direct supervisors and the Regional HR Manager created a harassing, hostile, stressful, working environment for Plaintiff.

110.    Additional conduct that Plaintiff believes related to his age includes the following:

a.    He was scheduled for a vacation for the week of August 23, 2019. Brookhouser called him on August 19th and told him that he had to cancel the vacation because the store was still busy for the Back to School season. Considering the constant harassment from Brookhouser, Plaintiff felt that he had to cancel his vacation. Plaintiff learned later that a younger Store Director was allowed to go on vacation that same week.

b.    The HR ETL completed schedules through January 2020. Plaintiff had asked the HR ETL to work it out on the schedule that each ETL and Plaintiff could have a 3- or 4-day weekend in January, to give everyone a short break from the Black Friday and Christmas hours. The HR ETL submitted the schedule to Brookhouser for his approval. Brookhouser rejected the schedule and said there was to be no extra time off in January. Plaintiff found out later that Brookhouser himself took vacation the second week of January.

c.    Brookhouser and Pavan routinely sent out birthday text messages to the Store Directors in different group texts, wishing them a happy birthday. The year Plaintiff turned 62, both Brookhouser and Pavan neglected to acknowledge Plaintiff's birthday.

11

111.     Faced with unrelenting stress caused by his superiors' discrimination and harassing treatment, Plaintiff went on medical leave on or about November 22, 2019.

112.     Prior to going on medical leave, Plaintiff submitted a complaint concerning his age discrimination/hostile work environment/retaliation concerns to Target on or about November 20, 2019.

113.     Plaintiff never heard a word from Target concerning any investigation into his complaints of age discrimination, hostile working environment, or retaliation.

114.     Plaintiff remained out on medical leave through early February 2020.

115.     Plaintiff's leave, however, was about to expire, and since he had not heard a word from Target concerning his complaints, Plaintiff was faced with no other choice than to submit his resignation to Target.

116.     Plaintiff submitted his resignation to Target on or about February 12, 2020.

117.     Target accepted Plaintiff's resignation—without providing any feedback or information concerning Plaintiff's complaints—on or about February 13, 2020.

118.     Plaintiff's store in Springfield was his community for 13 years, and he was well known throughout the community because of the store, through volunteerism, recruitment at local universities, business interactions, and personal interactions with the store's guests.

119.     After 17 very successful years as a Target Store Director, Plaintiff thought he would have the opportunity to retire at full retirement age, with dignity.

120.     He thought there would be a pathway to retirement.

121.     Instead, Plaintiff was humiliated, harassed, and ultimately pushed out due to a hostile work environment—all things that Brookhouser, Pavan, DeVasier, and Plaintiff's other supervisors were hoping for all along.

122.    ***Charge of Discrimination.*** On or about March 9, 2020, Plaintiff filed a Charge of Discrimination against Target with the Missouri Commission on Human Rights (the "MCHR") and the EEOC alleging, concerning Target's discrimination against him.

123.    On or about September 18, 2020, the MCHR issued a Notice of Right to Sue to Plaintiff in connection with his Charge of Discrimination indicating that he could bring a suit against Target within 90 days of the date that he received the Notice of Right to Sue.

124.    On or about September 29, 2020, the EEOC issued a Notice of Right to Sue to Plaintiff in connection with his Charge of Discrimination indicating that he could bring a suit against Target within 90 days of the date that he received the Notice of Right to Sue.

## COUNT I – HOSTILE WORK ENVIRONMENT (MHRA)

125.    Plaintiff incorporates the allegations set forth above in paragraphs 1 through 124 as if fully set forth herein.

126.    Target is a covered employer under the MHRA, and Plaintiff, who is over the age of 40 and under the age of 70, is a covered employee under the MHRA.

127.    For the last several months of Plaintiff's employment, and as explained above, Plaintiff was subjected to harassment and hostile treatment that was directly tied to Plaintiff's age.

128.    Plaintiff's age—he was 62 at the time of the conduct at issue—was the motivating factor in Target's harassment of Plaintiff.

129.    As explained above, the terms, conditions, and privileges of Plaintiff's employment were affected by the harassment and hostile treatment—among other things, Plaintiff was precluded from making decisions, shut out of meetings that he previously had participated in, screamed at by his supervisors, and generally made to feel as if he was worthless and that everyone

13

in the store that he had worked with for so many years believed he needed to retire on account of his age.

130.    Plaintiff made a host of complaints to Target concerning the harassment that he was receiving— first, he talked to Brookhouser and Pavan about how their age-related criticisms of him were unwarranted and that he did not believe that his ETLs believed he needed to retire on account of his age.

131.    Second, before going out on medical leave that was necessitated by the harassment and hostile working conditions, Plaintiff filed a lengthy complaint with Target concerning the harassment and hostile working conditions at issue herein.

132.    Though Plaintiff's supervisors and Target itself were aware of Plaintiff's complaints, Target never responded to Plaintiff's concerns and never got in touch with Plaintiff to discuss his concerns.

133.    Target's conduct—its turning a blind eye toward Plaintiff's complaints—in giving Plaintiff the cold shoulder while he was out on medical leave, and the harassment and hostile work environment that Plaintiff found himself in prior to going out on medical leave, rendered Plaintiff's working conditions so intolerable that Plaintiff was forced to quit a job that he loved.

134.    Target's conduct in this regard caused Plaintiff damages.

135.    Additionally, Target's conduct in this regard was wanton and willful and warrants an award of punitive damages.

WHEREFORE, Plaintiff Jerald McMillan respectfully requests judgment against Target for his actual damages, for compensatory damages, for punitive damages, for any other damages available to him under the MHRA, and for his reasonable attorneys' fees, costs, and expenses.

## COUNT II – AGE DISCRIMINATION (MHRA)

136. Plaintiff incorporates the allegations set forth above in paragraphs 1 through 135 as if fully set forth herein.

137. Target is a covered employer under the MHRA, and Plaintiff, who is over the age of 40 and under the age of 70, is a covered employee under the MHRA.

138. As discussed above, after turning 62, Plaintiff noticed that he began being treated differently by his supervisors, and on information and belief, Target treated Plaintiff differently than it treated similarly-situated individuals who were younger than Plaintiff and who did not earn as much as Plaintiff earned at Target.

139. After complaining to Target and his supervisors about the discriminatory treatment that he was being subjected to, Plaintiff never heard from Target about Plaintiff's concerns and never got in touch with Plaintiff to discuss his concerns.

140. Target's conduct—its turning a blind eye toward Plaintiff's complaints—in giving Plaintiff the cold shoulder while he was out on medical leave, and the discrimination that Plaintiff was experiencing from his supervisors, rendered Plaintiff's working conditions so intolerable that Plaintiff was forced to quit a job that he loved.

141. Target's conduct in this regard caused Plaintiff damages.

142. Additionally, Target's conduct in this regard was wanton and willful and warrants an award of punitive damages.

WHEREFORE, Plaintiff Jerald McMillan respectfully requests judgment against Target for his actual damages, for compensatory damages, for punitive damages, for any other damages available to him under the MHRA, and for his reasonable attorneys' fees, costs, and expenses.

## COUNT III – RETALIATION (MHRA)

143.    Plaintiff incorporates the allegations set forth above in paragraphs 1 through 142 as if fully set forth herein.

144.    Target is a covered employer under the MHRA, and Plaintiff, who is over the age of 40 and under the age of 70, is a covered employee under the MHRA.

145.    As set forth above, Plaintiff made a host of complaints to Target concerning the harassment that he was receiving— first, he talked to Brookhouser and Pavan about how their age-related criticisms of him were unwarranted and that he did not believe that his ETLs believed he needed to retire on account of his age.

146.    Second, before going out on medical leave that was necessitated by the harassment and hostile working conditions, Plaintiff filed a lengthy complaint with Target concerning the harassment and hostile working conditions at issue herein.

147.    Following his complaints to Brookhouser and Pavan, their treatment of Plaintiff got even worse.

148.    Following his complaints to Target, Target disregarded its company policies, refused to investigate Plaintiff's complaints, never talked to Plaintiff about the complaints, and gave Plaintiff the impression that his complaints were being ignored.

149.    Plaintiff's supervisors' and Target's conduct in this regard rendered Plaintiff's working conditions so intolerable that Plaintiff was forced to quit a job that he loved.

150.    This conduct caused Plaintiff damages.

151.    Additionally, Target's conduct in this regard was wanton and willful and warrants an award of punitive damages.

WHEREFORE, Plaintiff Jerald McMillan respectfully requests judgment against Target for his actual damages, for compensatory damages, for punitive damages, for any other damages available to him under the MHRA, and for his reasonable attorneys' fees, costs, and expenses.

## COUNT IV – HOSTILE WORK ENVIRONMENT (ADEA)

152.    Plaintiff incorporates the allegations set forth above in paragraphs 1 through 151 as if fully set forth herein.

153.    Plaintiff is an "employer" under the ADEA, and Plaintiff is an "employee" under the ADEA.

154.    For the last several months of Plaintiff's employment, and as explained above, Plaintiff was subjected to harassment and hostile treatment that was directly tied to Plaintiff's age.

155.    Plaintiff's age—he was 62 at the time of the conduct at issue—was the motivating factor in Target's harassment of Plaintiff.

156.    As explained above, the terms, conditions, and privileges of Plaintiff's employment were affected by the harassment and hostile treatment—among other things, Plaintiff was precluded from making decisions, shut out of meetings that he previously had participated in, screamed at by his supervisors, and generally made to feel as if he was worthless and that everyone in the store that he had worked with for so many years believed he needed to retire on account of his age.

157.    Plaintiff made a host of complaints to Target concerning the harassment that he was receiving—first, he talked to Brookhouser and Pavan about how their age-related criticisms of him were unwarranted and that he did not believe that his ETLs believed he needed to retire on account of his age.

17

158.    Second, before going out on medical leave that was necessitated by the harassment and hostile working conditions, Plaintiff filed a lengthy complaint with Target concerning the harassment and hostile working conditions at issue herein.

159.    Though Plaintiff's supervisors and Target itself were aware of Plaintiff's complaints, Target never responded to Plaintiff's concerns and never got in touch with Plaintiff to discuss his concerns.

160.    Target's conduct—its turning a blind eye toward Plaintiff's complaints—in giving Plaintiff the cold shoulder while he was out on medical leave, and the harassment and hostile work environment that Plaintiff found himself in prior to going out on medical leave, rendered Plaintiff's working conditions so intolerable that Plaintiff was forced to quit a job that he loved.

161.    Target's conduct in this regard caused Plaintiff damages.

WHEREFORE, Plaintiff Jerald McMillan respectfully requests judgment against Target for his lost wages and benefits, liquidated damages, for any other damages available to him under the ADEA, and for his reasonable attorneys' fees, costs, and expenses.

## COUNT V – AGE DISCRIMINATION (ADEA)

162.    Plaintiff incorporates the allegations set forth above in paragraphs 1 through 161 as if fully set forth herein.

163.    Plaintiff is an "employer" under the ADEA, and Plaintiff is an "employee" under the ADEA.

164.    As discussed above, after turning 62, Plaintiff noticed that he began being treated differently by his supervisors, and on information and belief, Target treated Plaintiff differently than it treated similarly-situated individuals who were younger than Plaintiff and who did not earn as much as Plaintiff earned at Target.

165.    After complaining to Target and his supervisors about the discriminatory treatment that he was being subjected to, Plaintiff never heard from Target about Plaintiff's concerns and never got in touch with Plaintiff to discuss his concerns.

166.    Target's conduct—its turning a blind eye toward Plaintiff's complaints—in giving Plaintiff the cold shoulder while he was out on medical leave, and the discrimination that Plaintiff was experiencing from his supervisors, rendered Plaintiff's working conditions so intolerable that Plaintiff was forced to quit a job that he loved.

167.    Target's conduct in this regard caused Plaintiff damages.

WHEREFORE, Plaintiff Jerald McMillan respectfully requests judgment against Target for his lost wages and benefits, liquidated damages, for any other damages available to him under the ADEA, and for his reasonable attorneys' fees, costs, and expenses.

## COUNT VI – RETALIATION (ADEA)

168.    Plaintiff incorporates the allegations set forth above in paragraphs 1 through 167 as if fully set forth herein.

169.    Plaintiff is an "employer" under the ADEA, and Plaintiff is an "employee" under the ADEA.

170.    As set forth above, Plaintiff made a host of complaints to Target concerning the harassment that he was receiving— first, he talked to Brookhouser and Pavan about how their age-related criticisms of him were unwarranted and that he did not believe that his ETLs believed he needed to retire on account of his age.

171.    Second, before going out on medical leave that was necessitated by the harassment and hostile working conditions, Plaintiff filed a lengthy complaint with Target concerning the harassment and hostile working conditions at issue herein.

172.    Following his complaints to Brookhouser and Pavan, their treatment of Plaintiff got even worse.

173.    Following his complaints to Target, Target disregarded its company policies, refused to investigate Plaintiff's complaints, never talked to Plaintiff about the complaints, and gave Plaintiff the impression that his complaints were being ignored.

174.    Plaintiff's supervisors' and Target's conduct in this regard rendered Plaintiff's working conditions so intolerable that Plaintiff was forced to quit a job that he loved.

175.    This conduct caused Plaintiff damages.

WHEREFORE, Plaintiff Jerald McMillan respectfully requests judgment against Target for his lost wages and benefits, liquidated damages, for any other damages available to him under the ADEA, and for his reasonable attorneys' fees, costs, and expenses.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury for the foregoing causes of action.

## DESIGNATION OF PLACE OF TRIAL

Plaintiffs hereby request the trial be held in Kansas City, Missouri.

## CIVIL COVER SHEET

Attached as **Exhibit A** is a copy of the Civil Cover Sheet.

**HKM EMPLOYMENT ATTORNEYS LLP**

By:     */s/ Brad K. Thoenen*
        Brad K. Thoenen, KS 24479
        bthoenen@hkm.com
        John J. Ziegelmeyer III, KS 23003
        jziegelmeyer@hkm.com
        1501 Westport Road
        Kansas City, Missouri 64111
        816.875.9339

        ATTORNEYS FOR PLAINTIFF